FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT, E.D.N.Y.

★        AUG 19 2005        ★

P.M. _____
TIME A.M. _____

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X

ALEKSEY SHAPURKIN,                          :        03 CV 5240 (ARR)(KAM)
                                            :
                      Plaintiff,            :        NOT FOR ELECTRONIC
                                            :        OR PRINT
       -against-                            :        PUBLICATION
                                            :
SSI SERVICES FLQ, INC. and ANDREW WELCH,    :        OPINION AND ORDER
                                            :
                      Defendants.           :
                                            :
------------------------------------------------------------------ X

ROSS, United States District Judge:

Plaintiff Aleksey Shapurkin ("Shapurkin" or "plaintiff") filed a complaint in New York

state court on September 25, 2003, against defendants SSI Services FLQ, Inc. ("SSI") and

Andrew Welch ("Welch"), alleging that Welch, driving a car owned by SSI, had acted

negligently and caused an accident on September 14, 2001 resulting in a serious injury to

plaintiff, as defined by N.Y. Ins. Law § 5102(d), and damages to plaintiff's car. Defendants

thereafter removed the case to federal court on the basis of diversity jurisdiction. Defendants

have now filed a motion for summary judgment, arguing that there is no evidence that Welch

operated SSI's vehicle negligently or that plaintiff suffered a serious injury as defined by New

York law. For the reasons stated below, defendants' motion for summary judgment is granted

in part and denied in part.

## BACKGROUND

The following facts are undisputed unless otherwise noted. Shapurkin and Welch,

driving a car owned by his employer SSI, collided at the intersection of Fort Hamilton Parkway

and 61st Street in Brooklyn early in the morning of September 14, 2001. Police arrived at the scene of the accident at 4:55 a.m., Defendants' Ex. I, having been notified of the accident between twenty minutes and one hour earlier. Defendants' Ex. G at 34; Defendants' Ex. F at 39. Shapurkin was traveling north on 61st Street, and Welch was driving east on Fort Hamilton Parkway when the front of Shapurkin's car struck the passenger side of Welch's car in the intersection. Defendants' Ex. F at 35; Defendants' Ex. G at 15, 26. Defendants have submitted the affidavit of an engineer, James Somerset, opining that, having reviewed the deposition transcripts, photographs of the accident, and the damage to Welch's car, Welch entered the intersection first. Defendants' Ex. K.

Shapurkin testified that, at the time he entered the intersection, the traffic signal was inoperable. Defendants' Ex. F at 32. He further testified that, having noticed that the traffic light was turned off, he proceeded slowly after coming to a complete stop. Id. at 34, 36. Welch testified that the traffic light at the intersection of Fort Hamilton and 61st Street was green when he first observed it but that he did not know if it had changed before the accident occurred. Defendants' Ex. G at 22. Welch further testified that more than one minute passed from the time he first observed the traffic light until the moment the accident happened. Id. at 23. The police report completed on September 14, 2001 indicates that Shapurkin observed that the signal was inoperable before the accident and that Welch had not observed the light. Defendants' Ex. E. A message generated by computer at 4:53 a.m. indicates that the traffic light at the intersection of Fort Hamilton Parkway and 61st Street was not operating properly. Defendants' Ex. H.

Following the accident, plaintiff complained of injuries to his neck, his left knee, and his lower back. Defendants' Ex. F at 46. Shapurkin testified that he sought medical treatment at the R.A.Y. Medical Center within one or two days of the accident. Id. at 48. He further testified that he underwent a battery of tests, id. at 49-50, and that his treatment continued for a few months. Id. at 52, 54. The earliest record evidence from R.A.Y. Medical Center indicates, however, that Shapurkin was first seen there on September 27, 2001. Defendants' Ex. L.

Shapurkin had been involved in a previous car accident on November 26, 1998, undergoing a course of medical treatment at that time. Defendants' Ex. F. at 23, 25. He testified that he gave up playing tennis and soccer for one to one and one-half years following that accident. Id. at 65. Defendants' medical expert, Dr. Jeffrey Spivak, opined initially, and again after having reviewed records relating to plaintiff's treatment following the 1998 accident, that the 2001 accident exacerbated Shapurkin's preexisting condition. Defendants' Ex. N at C.

Dr. Spivak examined Shapurkin on November 8, 2004 and reviewed the medical records relating to the September 14, 2001 accident. Defendants' Ex. N at C. The doctor noted in his initial report that Shapurkin indicated he had never fully recovered from his first accident. Id. Dr. Spivak acknowledged that plaintiff's range of motion was approximately eighty percent of published norms, but he noted that he had no measure of Shapurkin's range of motion before the 2001 accident. Id. Dr. Spivak also reviewed a cervical MRI dated October 12, 2001, disagreeing with Dr. John Lyons's conclusion that the test showed a C5-6 bulge. Dr. Spivak found "no significant abnormality on this scan whatsoever, not even a bulge." Id. The doctor also reviewed an MRI of the lumbar spine dated October 26, 2001,

3

again disagreeing with Dr. Lyons that the test revealed an L4-5 bulge. Dr. Spivak concluded that the "[s]can is essentially normal" and that "[t]here is not even a bulge." Id. He did note, however, congenital changes that are found in approximately five to ten percent of the population. Id.

The medical records indicated to Dr. Spivak that Shapurkin had first sought medical treatment on September 27, 2001, approximately two weeks after the accident, and that there was no evidence of any medical treatment after 2001. Dr. Spivak concluded that all positive findings, including the reported limitations on plaintiff's range of motion found by Dr. Aric Hausknecht, were subjective and that all objective aspects of the evaluation were negative. Id. He opined that any limitation on plaintiff's range of motion "may represent pre-existing loss" and that the September 14, 2001 accident exacerbated Shapurkin's previous soft tissue injury. Id.

Having subsequently reviewed records pertaining to the 1998 accident and a revised report of the plaintiff's medical expert dated April 1, 2005, Dr. Spivak reaffirmed his initial conclusion that the 2001 accident "exacerbated the previous soft tissue injury." Defendants' Ex. N at C. Among the records reviewed by Dr. Spivak were an MRI performed on February 7, 1999 that revealed a disc bulge at L3-4 and L4-5, and an EMG performed on January 19, 1999 that revealed evidence of acute L5 radiculopathy on the right side.[1] Defendants' Ex. M. Dr. Spivak also reviewed a report dated April 1, 1999, in which Dr. Alexander Rozenberg

---

[1] In a letter from defendant's medical expert, Dr. Jeffrey Spivak, to defense counsel dated April 12, 2005, the expert affirmed that he had reviewed the medical records pertaining to the 1998 accident, including the MRI and EMG reports, and reiterated the conclusion that he had reached in his previous affirmation. Defendants' Ex. N at C.

opined that Shapurkin had "functional limitations that are causally related to the motor vehicle accident that occurred on November 26, 1998" and "[t]he patient's prognosis for complete recovery to the state that precedes the accident has occurred." Id. Dr. Rozenberg further noted that certain activities might cause pain and limit Shapurkin's daily activities. Id. These records did not alter Dr. Spivak's earlier conclusion that the 2001 accident exacerbated Shapurkin's previous injury. Dr. Spivak further opined, with respect to Dr. Hausknecht's examination of plaintiff in 2004, that the use of a diarthrodial protractor to measure loss of range of motion was "a relatively subjective measure" depending on the motion that "the patient is willing to perform." Id.

Defendants have also submitted an affirmation of Dr. Peter Chiu.[2] Dr. Chiu examined Shapurkin on December 10, 2001, but did not review any medical records or reports. Defendants' Ex. P. Dr. Chiu concluded that Shapurkin had a resolved cervical and lumbar sprain or strain and that he was "capable of all normal activities, including full student/ work activities without any limitations." Id. Dr. Chiu also concluded that "treatment is no longer medically necessary and further treatment would be excessive." Id.

In addition to his deposition testimony, Shapurkin has submitted an affidavit dated July 8, 2005. Plaintiff's Ex. A. Shapurkin states in the affidavit that he had "partially recovered" from his injuries caused by the 1998 accident at the time of the 2001 accident. Id. ¶ 4. Shapurkin missed approximately five classes in the week following the 2001 accident. Id. ¶ 6.

---

[2]Defendants submitted an affirmation of Brian Wolin, who is a chiropractor, with Dr. Chiu's affirmation. Defendants' Ex. P. Wolin's affirmation, which was not subscribed before a notary or other authorized official, is inadmissible. N.Y. C.P.L.R. 2106; Grossman v. Wright, 268 A.D.2d 79, 85 (2d Dep't 2000).

He stated that he returned to school because his education was important to him, and he did not want to jeopardize his grades. Id. He also returned to work at a college library shortly after the accident, stating that the work was "physically easy" and that he needed the income. Id. Shapurkin states that he cannot play tennis or soccer and that he has had to give up roller blading and bicylcing as a result of the 2001 accident. Id. ¶ 7. He also states that he remains unable to lift heavy objects, to sit or stand for extended periods, and to bend without difficulty. Id. Shapurkin indicates that he paid for the medical treatment he received following the 2001 accident with "'no-fault' benefits," and that he stopped treatment once those benefits were terminated because he could not afford to pay medical expenses out of pocket. Id. ¶ 8. He further states that he stopped treatment because it helped only temporarily and that he has continued to perform stretching exercises that were recommended by his doctor. Id. ¶ 9, 10.

Dr. John S. Lyons performed an MRI of Shapurkin's cervical spine on October 12, 2001. He concluded that "the discs are well maintained in height and hydration," noting that there were indications "compatible with a bulge" on the C5-6 disc. Plaintiff's Ex. B. Dr. Lyons performed an MRI of plaintiff's lumbosacral spine on October 26, 2001. He again concluded that the "discs are well maintained in height and hydration," noting that there were indications "compatible with a bulge" on the L4-5 disc. Id.

Shapurkin was first treated following the 2001 accident by Dr. Kevin Custis.[3] Plaintiff's Ex. F. Shapurkin apparently did not inform Dr. Custis that he had suffered injuries as a result of the 1998 accident. At the time he prepared his undated report, Dr. Custis had

---

[3]While Dr. Custis's report is not in the form of an affirmation, plaintiff's expert, Dr. Hausknecht has submitted sworn reports in which he relies on the report of Dr. Custis.

reviewed the MRIs performed by Dr. Lyons and concluded that Shapurkin had an L4-5 bulge and a C5-6 bulge. Id. Dr. Custis concluded that Shapurkin's "condition is directly related to the motor vehicle accident on 09/14/01" and that he did "not have past medical history that may have contributed to these problems." Id. Dr. Custis had also performed a range of motion examination using an inclinometer, finding a ten percent loss of range of motion in plaintiff's cervical spine, an eighteen percent loss in plaintiff's lumbar spine, and an overall spine impairment of twenty-six percent. Plaintiff's Ex. H.

Plaintiff's medical expert, Dr. Hausknecht, prepared his initial report on October 15, 2004. Plaintiff's Ex. C. Dr. Hausknecht measured Shapurkin's range of motion using an arthroidal protractor, finding a twenty percent loss of range of motion in the cervical spine and a twenty percent loss in the lumbar spine. Id. He reviewed the MRIs performed by Dr. Lyons and agreed that plaintiff has a C5-6 disc bulge and an L4-5 disc bulge. Id. Dr. Hausknecht concluded "[w]ith a reasonable degree of medical certainty" that the 2001 accident "exacerbated [Shapurkin's] underlying condition" and was a proximate cause of his current injuries. Id. The doctor also concluded that Shapurkin had "received an adequate course of conservative management and has reached maximal medical improvement," opining that his condition was permanent in nature. Id. Dr. Hausknecht further opined that the MRIs demonstrate that Shapurkin "has sustained significant limitation of function of his cervical and lumbosacral spine" and that his injuries "have had a significant impact on his activities of daily living." Id. Finally, the doctor concluded that Shapurkin had "sustained permanent consequential limitation of function of his neurologic and musculoskeletal system." Id.

Having reviewed the medical records pertaining to the 1998 accident, Dr. Hausknecht prepared another report dated March 25, 2005. Plaintiff's Ex. D. The doctor reached substantially the same conclusions he had reached in his earlier report. Id. Dr. Hausknecht prepared yet another report on April 1, 2005 in which he again reached the same conclusions. Plaintiff's Ex. H. Finally, Dr. Hausknecht prepared an addendum to his earlier reports dated July 8, 2005. Plaintiff's Ex. E. In the addendum, the doctor reiterated his agreement with Dr. Lyons that the MRIs from October 2001 showed disc bulges at C5-6 and L4-5. Id. Dr. Hausknecht also reiterated that he had measured Shapurkin's range of motion with an arthroidal protractor and analyzed the results in comparison with normal ranges of motion, finding a twenty percent loss in the cervical spine and a twenty percent loss in the lumbar spine. Id.

## DISCUSSION

I.      Standard of Review for Summary Judgment

Under Rule 56, summary judgment is proper if the pleadings, depositions, answers, interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). An issue of fact is genuine when "a reasonable jury could return a verdict for the nonmoving party," and facts are material to the outcome of the litigation if application of the relevant substantive law requires their determination. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). The moving party has the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." Celotex Corp. v. Cartrett, 477

8

U.S. 317, 323 (1986). The substantive law determines the facts that are material to the outcome

of a particular litigation. See Anderson, 477 U.S. at 250; Heyman v. Commerce & Indus. Ins.

Co., 524 F.2d 1317, 1320 (2d Cir. 1975). In determining whether summary judgment is

appropriate, a court must resolve all ambiguities, and draw all reasonable inferences against the

moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88

(1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)).

If the moving party meets its burden, the burden then shifts to the non-moving party to

come forward with "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P.

56(e). The non-moving party must "do more than simply show there is some metaphysical doubt

as to the material facts." Matsushita, 475 U.S. at 586. "[T]he mere existence of some alleged

factual dispute between the parties will not defeat an otherwise properly supported motion for

summary judgment; the requirement is that there be no genuine issue of material fact." Anderson,

477 U.S. at 247-48. Only when it is apparent that no rational finder of fact "could find in favor

of the non-moving party because the evidence to support its case is so slight" should summary

judgment be granted. Gallo v. Prudential Residential Servs. Ltd. Partnership, 22 F.2d 1219, 1223

(2d Cir. 1994).

Defendants have raised two questions in their summary judgment motion: (1) whether

plaintiff has established a genuine issue of material fact as to liability; and (2) whether plaintiff

has established a genuine issue as to whether he suffered a "serious injury" as defined in N.Y.

Ins. Law § 5102(d). New York has a no-fault insurance scheme, which limits the causes of

action available against insured motorists. Under the New York plan, losses are generally

compensable only via insurance claims. A common law tort claim for non-economic injuries

9

is available only when the plaintiff has suffered a "serious injury." See N.Y. Ins. Law §

5104(a). Serious injury is defined as a personal injury which results in:

(1) "death;"
(2) "dismemberment;"
(3) "significant disfigurement;"
(4) "a fracture"
(5) "loss of a fetus"
(6) "permanent loss of use of a body organ, member, function or system;"
(7) "permanent consequential limitation of use of a body organ or member;"
(8) "significant limitation of use of a body function or system;" or
(9) "a medically determined injury or impairment of a non-permanent nature which prevents the injured person from performing substantially all of the material acts which constitute such person's usual and customary daily activities for not less than ninety days during the one hundred eighty days immediately following the occurrence of the injury or impairment."

N.Y. Ins. Law § 5102(d). The court must determine as a threshold question "whether the

evidence would warrant a jury finding that the injury falls within the class of injuries that,

under no-fault, should be excluded from judicial remedy." Licari v. Elliott, 57 N.Y.2d 230,

238, 441 N.E.2d 1088, 1092, 455 N.Y.S.2d 570, 574 (1982).

II.    Liability

Defendants argue that no reasonable juror could conclude that Welch was operating his

vehicle negligently when the accident occurred. The court does not agree. Plaintiff testified

that he was driving at approximately twenty-five miles an hour on 61st Street immediately

before the accident. He further testified that, having observed that the traffic light was turned

off, he came to a complete stop at the intersection with Fort Hamilton Parkway before

proceeding slowly, at which point the collision occurred. Defendants' Ex. F at 34-35, 36.

Welch testified that when he first observed the traffic light controlling his lane, it was green.

Defendants' Ex. G at 22. He also testified that he first observed the traffic light when he was

two blocks away from it and driving less than twenty miles an hour. Id. at 20-21. He further testified that he did not know whether the light changed before the accident occurred, id., and estimated that more than one minute passed between the time he first observed the traffic light and the moment the accident happened. Id. at 23. Finally, Welch testified that he entered the intersection driving twenty-five miles an hour and that his entire car was in the intersection at the time of the accident. Id. at 25.

Viewing the evidence in the light most favorable to the plaintiff and drawing all reasonable inferences in his favor, the court is not able to conclude that no reasonable juror could find that Welch was negligent. Plaintiff testified that he came to a complete stop at the intersection before proceeding slowly through it. Defendant appears to have testified that he noticed that the controlling traffic light was green when he was two blocks away, that approximately one minute passed from that moment until the accident happened, and that he did not know if the light was green when he entered the intersection driving approximately twenty-five miles an hour. Neither the evidence that the traffic light was not working properly as of 4:53 a.m. nor the engineer's opinion that Welch was first into the intersection shed further light on the material factual issues pertaining to liability. While there is no evidence that Welch's light was green at the time he entered the intersection, there is evidence that Shapurkin came to a complete stop before cautiously entering the intersection and that Welch entered the intersection driving twenty-five miles an hour. The deposition testimony of Shapurkin and Welch gives rise to a genuine issue of material fact as to liability, and the court must therefore deny defendants' motion for summary judgment on liability.

III.    Serious Injury

11

To prevail on summary judgment in the "serious injury" context, the defendant must initially establish a prima facie case that the plaintiff did not sustain a serious injury within the meaning of New York's No-Fault Insurance Law. Barth v. Harris, No. 00 Civ. 1658, 2001 WL 736802, at *2 (S.D.N.Y. June 25, 2001). To meet this burden, the defendant may rely on unsworn reports by plaintiff's physicians, see McGovern v. Walls, 201 A.D.2d 628-29 (2d Dep't 1994), but reports by defendant's own retained physicians must be in the form of sworn affidavits or affirmations. See Marsh v. Wolfson, 186 A.D.2d 115, 115-16 (2d Dep't 1992); N.Y. C.P.L.R. 2106. Once the defendant has established a prima facie case that the plaintiff has not suffered a "serious injury" within the meaning of the statute, the burden shifts to the plaintiff to come forward with sufficient evidence to support his or her claim. Ebewo v. Martinez, 309 F.Supp.2d 600, 604 (S.D.N.Y. 2004) (citing Gaddy v. Eyler, 79 N.Y.2d 955 (1992)). Plaintiff must submit admissible evidence in the form of sworn affidavits or affirmations by physicians. Barth, 2001 WL 736802, at *2 (citing Bonsu v. Metro. Suburban Bus Auth., 202 A.D.2d 538 (2d Dep't 1994)).

The Court of Appeals has held that the statutory "serious injury" threshold requires objective proof of a plaintiff's injury; subjective complaints of pain alone will not suffice. Toure v. Avis Rent A Car Sys., Inc., 98 N.Y.2d 345, 350 (2002). Such proof may come in the form of: (1) "an expert's designation of a numeric percentage of a plaintiff's loss of range of motion;" or (2) "[a]n expert's qualitative assessment of a plaintiff's condition . . ., provided that the evaluation has an objective basis and compares the plaintiff's limitations to the normal function, purpose and use of the affected body organ, member, function or system." Id. (emphasis in original). The Court of Appeals subsequently stated that "even where there is

objective medical proof, when additional contributory factors interrupt the chain of causation between the accident and claimed injury–such as a gap in treatment, an intervening medical problem or a preexisting condition–summary dismissal of the complaint may be appropriate." Pommels v. Perez, 4 N.Y.3d 566, 572 (2005). The Court went on to note that while "the law surely does not require a record of needless treatment in order to survive summary judgment" where there has been a gap in or cessation of treatment, a plaintiff "must offer some reasonable explanation for" that gap or cessation. Id. at 575. The Court also indicated that where a defendant has offered evidence that a preexisting condition caused the injuries, the plaintiff bears the burden of coming forward with evidence addressing the claimed lack of causation. Id. at 580.

Shapurkin did not allege in his complaint that his injuries were serious under any particular clause of section 5102(d). He argues in his brief, however, that his injury constitutes a significant limitation of use of a body function or system ("significant limitation") and that his injury prevented him from performing substantially all of his daily activities for not less than ninety days during the one hundred eighty days immediately following the occurrence of the injury ("90/180 limitation"). Defendants contend that a reasonable jury could not conclude that Shapurkin's injuries were serious under any definition.

As a preliminary matter, defendants submitted medical evidence in support of their motion for summary judgment establishing a prima facie case that plaintiff had not sustained a serious injury within the meaning of section 5102(d). Having reviewed the MRIs from October 2001, defendants' expert opined that they revealed no bulges. Defendants' Ex. N at C. The expert also opined that the range of motion test performed by plaintiff's expert was

subjective in nature. Id. Finally, defendants at least raised an issue as to causation, identifying a cessation of treatment approximately three months after the accident and a preexisting condition that had not completely resolved at the time of the 2001 accident. The burden thus shifted to plaintiff to come forward with admissible proof to raise a triable issue of fact.

A.    Contributory Factors

Defendants contend that plaintiff has not adequately explained the cessation of treatment after the end of 2001 and that plaintiff has adduced insufficient evidence addressing defendants' proof that plaintiff's injuries are a mere exacerbation of a preexisting condition that was the result of the 1998 accident.

As to the former argument, defendants contend that plaintiff has failed to explain adequately what is approximately a three-year gap between plaintiff's treatment and subsequent re-examination. As the New York Court of Appeals found recently in Pommells, "the so-called gap in treatment" here "was, in reality, a cessation of all treatment." 4 N.Y.3d at 574. Plaintiff ceased medical and chiropractic treatment approximately three months after the accident, apparently seeking no other treatment until October 15, 2004 when he visited Dr. Hausknecht in connection with this case. "[A] cessation of treatment is not dispositive," but plaintiff must offer a "reasonable explanation." Id.

In his affidavit, Shapurkin explained that he failed to pursue further treatment due to financial constraints and the termination of no-fault benefits. Plaintiff's Ex. A ¶ 8-9. Shapurkin also explained that he stopped going to treatment because it provided only temporary relief. Id. ¶ 9. While the latter reason is unsubstantiated by anything but a report of plaintiff's medical expert dated October 15, 2004, self-serving, and entitled to little weight, see Thompson v. Abbasi, 15

14

A.D.3d 95, 99 (1st Dep't 2005), the court finds the former explanation sufficient to defeat

summary judgment.[4]  As courts have noted, "a plaintiff should be free to explain a gap in

treatment based on impecuniousness." Panchmia v. Tauber, 3 Misc. 3d 849, 775 N.Y.S.2d 490,

494 (N.Y. Civ. Ct. 2004); Ahmed v. Khan, 5 Misc.3d 129(A), 798 N.Y.S.2d 707 (N.Y. App.

Term 2004) (finding the gap in treatment to have been adequately accounted for where "plaintiff

explained that she had to stop treatment . . . because her no-fault insurance ran out and she could

not afford to pay for it herself.").

Defendants also argue that, at most, the September 14, 2001 accident exacerbated

Shapurkin's preexisting neck and back injuries, which were caused by the 1998 accident and

that plaintiff's expert has not shown what part of plaintiff's injuries are attributable to the 1998

accident as opposed to the 2001 accident.  Defendants' expert, Dr. Spivak, acknowledged that

the 2001 accident exacerbated Shapurkin's previous injury.  Defendants' Ex. N.  His opinion

supports, to some extent, plaintiff's claim.  See Derby v. Menchenfriend, 18 A.D.3d 694 (2d

Dep't 2005) (finding that defendant failed to make a prima facie showing that plaintiff did not

sustain a serious injury and noting that defendant's medical expert acknowledged that the

accident exacerbated plaintiff's preexisting condition).  Plaintiff's expert, Dr. Hausknecht, also

---

[4]The court finds Shapurkin's claim to be unlike the plaintiff's in Brown v. Dunlap, where
the plaintiff's doctor had determined that further therapy would be only palliative in nature and
instructed the plaintiff to continue exercises at home.  Confronted with this explanation for a
cessation of treatment, the Court of Appeals concluded that "[a] plaintiff need not incur the
additional expense of consultation, treatment or therapy, merely to establish the seriousness or
causal relation of his injury."  4 N.Y.3d at 577.  In the instant case, there is no evidence
contemporaneous to the cessation of treatment indicating a doctor's recommendation that further
treatment would be merely palliative.  Rather, the only evidence suggesting that plaintiff had
reached "maximal medical improvement" is contained in Dr. Hausknecht's October 15, 2004
report.  Plaintiff's Ex. C.

opined that the 2001 accident "exacerbated his underlying condition," referring to his "history of neck and back injuries related to a previous motor vehicle accident." Plaintiff's Ex. D. The record reveals some objective evidence, as required by Toure, in support of the conclusion that the 2001 accident actually exacerbated the injuries incurred during the 1998 accident. An MRI of the cervical spine following the 1998 accident revealed no disc bulges, and an MRI of the lumbosacral spine at that time revealed disc bulges at L3-4 and L4-5. Defendants' Ex. M. An MRI of the cervical spine performed on October 12, 2001 revealed a bulge at C5-6, and an MRI of the lumbar spine performed on October 26, 2001 revealed a bulge at L4-5. Plaintiff's Ex. B. Dr. Lyons's conclusion that Shapurkin had a disc bulge on the cervical spine following the 2001 accident is consistent with both medical experts' opinions that the 2001 accident exacerbated an underlying condition. While plaintiff's expert did not address in detail the proof that plaintiff's condition may have been partially caused by preexisting conditions, the court finds this evidence sufficient, for the purposes of defendants' motion for summary judgment, to establish causality.

B.      Significant Limitation

"Whether a limitation of use or function is 'significant' or 'consequential' relates to medical significance and involves a comparative determination of the degree or qualitative nature of an injury based on the normal function, purpose and use of the body part." Dufel v. Green, 84 N.Y. 2d 795, 798 (1995). Thus, to establish a "serious injury" under the eighth definition, plaintiff must submit quantitative evidence from an expert with respect to diminished range of motion or an expert's qualitative assessment, based on objective evidence,

16

comparing plaintiff's present limitations to the normal function, purpose and use of the affected body organ, member, function, or system.

Plaintiff has done so here. Although defendants' submissions contesting Dr. Lyons and Dr. Hausknecht's interpretations of the MRIs, opining that the range of motion tests were subjective in nature, and identifying contributory factors going to causality were sufficient to meet their initial burden, plaintiff's submissions in opposition raise material issues of fact as to whether he sustained a "serious injury." Plaintiff submitted an affirmed report from his medical expert specifying the decreased range of motion in his lumbar and cervical spines, along with evidence of disc bulges confirmed by MRI. Hyacinthe v. U-Haul Co., 278 A.D.2d 369, 370 (2d Dep't 2000) ("A bulging disc may constitute a serious injury within the meaning of Insurance Law § 5102(d)."). Dr. Hausknecht asserted that plaintiff's injuries were significant and causally related to the motor vehicle accident of September 14, 2001. This evidence is sufficient to raise a triable issue of fact. See Clervoix v. Edwards, 781 N.Y.S.2d 690 (2d Dep't 2004) (citing Toure, 98 N.Y.2d 345; Acosta v. Rubin, 2 A.D.3d 657 (2d Dep't 2003)).

Both medical experts, Dr. Hausknecht and Dr. Spivak, found Shapurkin's range of motion to be approximately eighty percent of published norms. Defendants' Ex. N at C; Plaintiff's Ex. E. A twenty-percent loss of range of motion raises a genuine issue of fact as to the existence of a serious injury. See Campbell v. Cloverleaf Transp., Inc., 5 A.D.3d 169, 170 (1st Dep't 2004); Howard v. King, 307 A.D.2d 278 (2d Dep't 2003). Range of motion tests performed in November 2001 also show losses of range of motion between ten and eighteen percent for the cervical and lumbar spines. Plaintiff's Ex. H. Defendants nonetheless argue that Dr. Hausknecht's findings are subjective, reflecting the patient's degree of compliance or

17

willingness. Notwithstanding Dr. Spivak's opinion to that effect, courts have found measures taken with arthroidal protractors to be sufficiently objective. Martin v. Pietrzak, 273 A.D.2d 361 (2d Dep't 2000) ("The plaintiff's injuries allegedly resulted in permanent significant range of motion limitations which were objectively measured using an arthroidal protractor."); Jelicks v. Camacho, 305 A.D.2d 373, 374 (2d Dep't 2003) (finding that the evidence submitted by plaintiff, including "quantified findings as to various limitations of motion as measured with the assistance of an arthrodial protractor" and an MRI, raised a genuine issue of material fact). In any event, Toure appears to require either an expert's "designation of a numeric percentage of a plaintiff's loss of range of motion" or a qualitative assessment of a plaintiff's condition if supported by objective evidence and a comparison of plaintiff's limitations to normal functions. 98 N.Y.2d at 350. Plaintiff's expert has both indicated a twenty-percent loss of range of motion, with which defendants' expert apparently concurs, and a qualitative assessment supported by MRIs from October 2001 indicating disc bulges.

Defendants also argue that courts, in order to permit a finding that an injury constituted a significant limitation, have required that the injury be more than fleeting in duration. Partlow v. Meehan, 155 A.D.2d 647, 648 (2d Dep't 1989). Defendants further argue that the cessation of treatment as of the end of 2001 is evidence that plaintiff's injury was not of substantial duration. The court notes that Dr. Hausknecht found a twenty-percent loss of range of motion in October 2004, more than three years after the injury occurred. His affirmation sufficiently establishes the duration of plaintiff's injury for the purposes of defendants' motion for summary judgment.

After reviewing the record as a whole, and taking the evidence in the light most favorable to plaintiff, the court finds that the medical evidence is sufficient to raise a triable question as to

whether Shapurkin suffered a significant limitation as to his neck and back under § 5102(d)'s definition of serious injury.

C.    90/180 Impairment

Plaintiff also alleges a "serious injury" because he suffered a medically determined injury that prevented him from performing substantially all of the material acts of his customary daily activities for at least 90 out of the first 180 days immediately following the injury. See D'Avolio v. Dictaphone Corp., 822 F.2d 5, 6 (2d Cir. 1987) (citing Stossel v. Fleyshmahker, 117 Misc.2d 454, 455, 458 N.Y.S.2d 484 (1983)). This threshold will not be satisfied if the evidence establishes only a "slight curtailment" of the plaintiff's usual activities. Short v. Shawn, 188 S.D.2d 815 (3d Dept. 1992). Moreover, the plaintiff is required to present more than personal self-serving testimony as to the inability to perform his usual and customary activities. Cullum v. Washington, 227 A.D.2d 370 (2d Dept. 1996).

Shapurkin indicated in his deposition testimony that he missed no work at the Brooklyn College Library as a result of the accident. Defendants' Ex. F at 55. He stated in his affidavit that the his job involved "mainly sitting," that it was "physically easy," and that he "needed the income." Plaintiff's Ex. A ¶ 6. Plaintiff also testified that he missed approximately five classes following the accident. Defendants' Ex. F at 54. He stated in his affidavit that he returned to class because he did not want to jeopardize his grades and that he would leave class early when he was in too much pain. Plaintiff's Ex. A ¶ 6. Shapurkin also stated in his affidavit that he remains unable to play tennis and soccer, to roller blade, or to ride a bicycle. Id. ¶ 7. Finally, he indicated that he is unable to lift heavy objects, to sit or stand for extended periods, and to bend without difficulty. Id.

19

Plaintiff argues that "[t]he mere fact that an injured party is able to return to work in some capacity within 90 days of an automobile accident is not necessarily fatal to his or her claim of serious injury." Baez v. Goldman, 180 Misc.2d 304, 305 (N.Y. App. Term 1999). Plaintiff also argues that "[t]he mere fact that plaintiff returned to school does not foreclose the issue as to whether his activities remained substantially impaired." Thomas v. Drake, 145 A.D.2d 687 (3d Dep't 1988). Unlike the plaintiff in Baez, however, Shapurkin has adduced no evidence that he was placed on "restricted duty" at work. Also, unlike the plaintiff in Thomas, plaintiff adduced no evidence that he walked with a limp or faced any other limitation at school. Rather, plaintiff's chief complaints appear to be that he had to give up various sports, which is not enough to satisfy his burden. Jones v. Norwich City School District, 283 A.D.2d 809, 812 (3d Dep't 2001) ("The limitations placed upon [plaintiff] with respect to sports and physical education, even for an extended period, is not enough" to show that her injuries prevented her from performing substantially all of her customary daily activities.); Mooney v. Edwards, 12 A.D.3d 424, 425 (2d Dep't 2004) (having found that "plaintiff's only current complaint was that he had difficulty in participating in recreational basketball and table tennis," the court found that plaintiff had not submitted any competent medical evidence indicating that his injuries prevented him from performing substantially all of the material acts which constituted his customary activities); Lauretta v. County of Suffolk, 273 A.D.2d 204, 205 (2d Dep't 2000) ("[P]laintiff's allegation in her affidavit that she was forced to curtail recreational and household activities was insufficient to demonstrate that she had sustained a medically-determined injury or impairment which prevent her from performing substantially all of the material acts constituting her normal daily activities" where plaintiff's medical expert had not

provided objective medical evidence.).  As the New York Court of Appeals has indicated, "[s]ince plaintiff was able to maintain his daily routine for most of each day after returning to work, it should be abundantly clear that plaintiff was not prevented from performing substantially all of his daily activities during anything close to 90 days following the occurrence of the injury."  Licari, 57 N.Y.2d at 238.

Perhaps most importantly, plaintiff has submitted no medical evidence contemporaneous with the period immediately following the 2001 accident indicating that he should not engage in his customary daily activities.  The only evidence of that sort is Dr. Hausknecht's October 15, 2004 report, in which he indicated that Shapurkin's injuries had a "significant impact on his activities of daily living," reiterating the difficulties Shapurkin identified in his affidavit.  As no reasonable juror could conclude that plaintiff's injury prevented him from performing substantially all of his customary daily activities for ninety days during the 180 days immediately following the accident, summary judgment for the defendants is appropriate on this claim.

## CONCLUSION

For the reasons stated above, defendants' motion for summary judgment is granted in part and denied in part. The court grants defendants' motion with respect to plaintiff's "90/180 impairment" claim, as no reasonable juror could conclude that plaintiff was prevented from performing substantially all of his customary daily activities for a period of ninety days during the 180 days immediately following the accident. The court denies defendants' motion with respect to plaintiff's "significant limitation" claim, however, as plaintiff has raised a genuine issue of material fact.

SO ORDERED.

Allyne R. Ross
United States District Judge

Dated: August 18, 2005
        Brooklyn, New York

22

SERVICE LIST:

Counsel for Plaintiff
Mark J. Linder
Harmon Linder & Rogowsky
299 Broadway
Suite 1305
New York, NY 10007

Counsel for Defendants
Susan B. Clearwater
Quirk and Bakalor, P.C.
845 Third Avenue, 15th Floor
New York, NY 10022-6601

Gloria Beatrice Dunn
Quirk & Bakalor, P.C.
845 Third Ave., 15th Floor
New York, NY 10022-6601

cc:      **Magistrate Judge Matsumoto**